**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| RANDY SICKLESMITH, on behalf of | : | |
| Himself and similarly situated | : | 19-cv-1675 |
| Employees, | : | |
| | : | |
| Plaintiffs | : | |
| | : | Hon. John E. Jones III |
| v. | : | |
| | : | |
| HERSHEY ENTERTAINMENT & | : | |
| RESPORTS COMPANY | : | |
| Defendants. | : | |

## MEMORANDUM AND ORDER

### February 25, 2020

Presently pending before this Court is Defendant's Motion to Dismiss. (Doc. 8). For the reasons that follow, we will deny the motion.

## I.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY

We take the following from the Plaintiff's Complaint and assume it to be true, as we must.

The instant case alleges a variety of wage-and-hour-related claims against Hershey Entertainment & Resorts Company resulting from Plaintiff Sicklesmith's employment as a server. Plaintiff Sicklesmith brings his claims on behalf of himself and a group of similarly-situated Hershey employees.

1

Plaintiff Sicklesmith was employed by Defendant at the "Houlihan's" restaurant in Hershey, Pennsylvania ("the Restaurant") from approximately January 2017 until September 2019. (Doc. 1 at ¶¶ 7, 9). During his employment, Plaintiff Sicklesmith was paid the Pennsylvania hourly tipped minimum wage of $2.83, plus tips from customers of the Restaurant. (*Id.* at ¶ 10). This tipped minimum wage falls below the Pennsylvania minimum wage of $7.25, but such a practice is permitted by Department of Labor ("DOL") regulations, providing that certain requirements are met. 29 C.F.R. §531.56(e). At issue here is whether Defendant complied with relevant regulations when it compelled Plaintiff Sicklesmith and the putative class to perform alleged non-tip-generating work while paying them the tipped minimum wage, as opposed to the higher minimum wage.

Plaintiff alleges that he and similarly-situated tipped servers employed by Defendant were required to perform impermissible "non-tip-producing work" during their shifts, including "rolling silverware; [*sic*] setting up drink stations, cleaning the soda machine, filling sauce containers, setting-up the salad cooler, preparing food, slicing fruit, sorting silverware and ramekins, and cleaning the Restaurant." (*Id.* at ¶ 12). While performing such tasks, Plaintiff Sicklesmith claims, he and other servers were not earning tips, nor did Defendant pay them the higher minimum wage required by regulation. (Id. at ¶ 10). Plaintiff further alleges

that he and the putative class of servers spent "at least 30% of their working hours" performing these non-tip-generating tasks in contravention of federal regulations limiting the amount of such work. (*Id.* at ¶ 14). Specifically, Plaintiff alleges that Defendant's tipped employees were required to perform these tasks in the hour prior to the Restaurant's opening and for 30 minutes at the end of the day, when "Restaurant mangers relieve[d] servers of their customer service duties to focus exclusively on performing non-tip producing work." (*Id.*).

Plaintiff Sicklesmith now brings the instant case alleging violations of the FLSA (Count I) and the PMWA (Count II). [1] He filed his Complaint on September 27, 2019. (Doc. 1). On December 2, 2019, Defendant filed a Motion to Dismiss, (Doc. 8), and an accompanying brief in support. (Doc. 9). Plaintiff Sicklesmith filed a brief in opposition on January 8, 2020. (Doc. 20). Defendant replied on January 29, 2020. (Doc. 23). The Motion is therefore ripe for disposition. For the reasons that follow, we shall deny the Motion.

---

[1]      "Because the PMWA substantially parallels the FLSA, federal courts are directed to interpretation of the FLSA when analyzing claims under the PMWA." *Razak v. Uber Techs., Inc.*, No. CV 16-573, 2016 WL 5874822, at *7 (E.D. Pa. Oct. 7, 2016) (internal quotation marks and citations omitted). Therefore, while we reference only the FLSA throughout this opinion, our reasoning applies equally to Plaintiff Sicklesmith's PMWA claims.

## II.    STATUTORY AND REGULATORY BACKGROUND

At its core, this case asks us to resolve a question of *Auer* deference to an agency's interpretation of a federal regulation. We begin, however, with a brief overview of the relevant statutory and regulatory schemes.

The DOL interprets the FLSA and its accompanying regulations. *See* 32 Fed. Reg. 222 (Jan. 10, 1967) (Notice of Proposed Rulemaking); 32 Fed. Reg. 13575 (Sept. 28, 1967) (Promulgation of Final Rule). This includes 29 U.S.C. §203(m), which governs the payment of tipped employees and the use of the "tip credit." Under both federal and Pennsylvania laws, employers must ensure that their tipped employees are paid the Pennsylvania minimum wage of $7.25 per hour. 29 U.S.C. §203(m). To calculate this minimum hourly wage, however, employers are permitted to add the tips earned by tipped employees to their hourly tipped wage. Such an addition is referred to as a "tip credit," and represents the difference between the Pennsylvania minimum wage of $7.25 per hour and the Pennsylvania hourly tipped minimum wage of $2.83 per hour. *Id.* In Pennsylvania, the "tip credit" employers are permitted to use to calculate wages for tipped employees is $4.42 per hour ($7.25-$2.83). However, if a tipped employee does not receive sufficient tips to earn the threshold minimum hourly wage during her shift, the employer is required to pay the difference. *Id.*

4

Generally, an employer may require tipped employees to perform some non-tip-generating tasks during their shifts while still taking advantage of the "tip credit" to pay their tipped employees a lower wage. 29 C.F.R. §531.56. However, federal regulations place restrictions on the amount and types of non-tip-producing work a tipped employee may be required to perform before she must be paid the full minimum wage. *Id*.

In a classic case of regulatory miasma, we now have before us two drastically different DOL readings of the relevant federal regulation. The regulation itself states, in relevant part:

> In some situations an employee is employed in a dual job, as for example, where a maintenance man in a hotel also serves as a waiter. In such a situation the employee, if he customarily and regularly receives at least $30 a month in tips for his work as a waiter, is a tipped employee only with respect to his employment as a waiter. He is employed in two occupations, and no tip credit can be taken for his hours of employment in his occupation of maintenance man. Such a situation is distinguishable from that of a waitress who spends part of her time cleaning and setting tables, toasting bread, making coffee and occasionally washing dishes or glasses. It is likewise distinguishable from the counterman who also prepares his own short orders or who, as part of a group of countermen, takes a turn as a short order cook for the group. Such related duties in an occupation that is a tipped occupation need not by themselves be directed toward producing tips. 29 C.F.R. § 531.56(e).

This regulation therefore creates a distinction between jobs that directly generate tips, which may be compensated at the lower hourly tipped wage, and those tasks

which do not directly engender tips, which require payment at the state's minimum wage.

In 1988, the DOL further elaborated upon this "dual jobs" concept, stating that "where the facts indicate that. . .tipped employees spend a substantial amount of time (in excess of 20 percent) performing general preparation work or maintenance, no tip credit may be taken for the time spent in such duties." U.S. Dept. of Labor, Wage & Hour Division, Field Operations Handbook at § 30d00(e) (Dec. 9, 1988). This language came to be known as the "80/20 Rule," and required employers to pay the full minimum wage to tipped employees for any amount of time spent on non-tip generating activities in excess of twenty percent of their shifts. *Id.* Generally, the courts provided deference to this DOL interpretation, which remained in effect until 2018. *See, e.g.*, *Fast v. Applebee's Int'l, Inc.*, 638 F.3d 872, 879 (8th Cir. 2011); *Barnhart v. Chesapeake Bay Seafood House Assocs., L.L.C.*, No. CV JFM-16-01277, 2017 WL 1196580, at *6 (D. Md. Mar. 31, 2017) (finding that "the majority of courts. . .have deferred to" the 80/20 Rule).

In 2018, the DOL issued an Opinion Letter which purported to change the 80/20 Rule because "the current [rule]. . .resulted in some confusion and inconsistent application." U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter FLSA 2018-27 (Nov. 8, 2018), 2018 WL 5921455. The DOL's new interpretation stated that "no limitation shall be placed on the amount of [non-tip-generating]

duties that may be performed, whether or not they involve direct customer service,

***as long as they are performed contemporaneously with the duties involving direct***

***service to customers or for a reasonable time immediately before or after***

***performing such direct services.*** *Id.* ("the 2018 Interpretation") (emphasis added).

The DOL's new interpretation, then, intends to focus not on the *percentage* of a

tipped employee's time that is spent on non-tip-generating tasks, but instead seeks

to inquire *when* those tasks are performed in relation to tip-generating tasks. The

Opinion Letter further stated that it constituted an "official statement of [DOL]

policy and an official ruling." *Id*.

Consistent with that Opinion Letter, the DOL revised its Field Operations

Handbook on February 15, 2019, including identical language as the Letter. U.S.

Dep't of Labor, Field Operations Handbook, § 30d00(f)(1)-(4) (rev. Feb. 15, 2019).

On the same day, the DOL issued a Field Assistance Bulletin that also purported to

override the 80/20 Rule. *See* U.S. Dep't of Labor, Wage & Hour Div., Field

Assistance Bulletin No. 2019-2 (Feb. 15, 2019).

## III.   STANDARD OF REVIEW

In considering a motion to dismiss pursuant to Rule 12(b)(6), courts "accept

all factual allegations as true, construe the complaint in the light most favorable to

the plaintiff, and determine whether, under any reasonable reading of the

complaint, the plaintiff may be entitled to relief." *Phillips v. Cty. of Allegheny*, 515

F.3d 224, 231 (3d Cir. 2008) (quoting *Pinker v. Roche Holdings, Ltd.*, 292 F.3d 361, 374 n.7 (3d Cir. 2002)).  In resolving a motion to dismiss pursuant to Rule 12(b)(6), a court generally should consider only the allegations in the complaint, as well as "documents that are attached to or submitted with the complaint, . . . and any matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, [and] items appearing in the record of the case." *Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006).

A Rule 12(b)(6) motion tests the sufficiency of the complaint against the pleading requirement of Rule 8(a). Rule 8(a)(2) requires that a complaint contain a short and plain statement of the claim showing that the pleader is entitled to relief, "in order to give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  While a complaint attacked by Rule 12(b)(6) motion to dismiss need not contain detailed factual allegations, it must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  To survive a motion to dismiss, a civil plaintiff must allege facts that "raise a right to relief above the speculative level…." *Victaulic Co. v. Tieman*, 499 F.3d 227, 235 (3d Cir. 2007) (quoting *Twombly*, 550 U.S. at 555).  Accordingly, to satisfy the plausibility standard, the complaint must indicate that defendant's liability is more

than "a sheer possibility." *Iqbal*, 556 U.S. at 678. "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

Under the two-pronged approach articulated in *Twombly* and later formalized in *Iqbal*, a district court must first identify all factual allegations that constitute nothing more than "legal conclusions" or "naked assertions." *Twombly*, 550 U.S. at 555, 557. Such allegations are "not entitled to the assumption of truth" and must be disregarded for purposes of resolving a 12(b)(6) motion to dismiss. *Iqbal*, 556 U.S. at 679. Next, the district court must identify "the 'nub' of the … complaint – the well-pleaded, nonconclusory factual allegation[s]." *Id.* Taking these allegations as true, the district judge must then determine whether the complaint states a plausible claim for relief. *See id.*

However, "a complaint may not be dismissed merely because it appears unlikely that the plaintiff can prove those facts or will ultimately prevail on the merits." *Phillips,* 515 F.3d at 231 (citing *Twombly*, 550 U.S. at 556-57). Rule 8 "does not impose a probability requirement at the pleading stage, but instead simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element." *Id.* at 234.

## IV.   DISCUSSION

Based upon the DOL's Current Opinion Letter, the new Field Operations Handbook, and the new Field Assistance Bulletin, Defendant now argues that we should dismiss the instant case for failure to state a claim. (Doc. 8). They maintain that their practice of assigning non-tip-generating tasks during the hour prior to the Restaurant's opening and for 30 minutes at the end of the day clearly complies with the 2018 Interpretation. (Doc. 9 at 6). As such, Defendant posits it has not violated the FLSA or the PMWA. (*Id.* at 6).

This new policy, Defendant argues, should be given deference over prior DOL interpretations because it constitutes a careful and considered change in light of the "confusion" caused by the 80/20 Rule. (*Id.* at 15-16). Furthermore, Defendant argues, our failure to defer to the newest iteration of DOL policy will cause "unfair surprise" to Defendant, who relied upon this rule in crafting its policies. (*Id*. at 21).

Plaintiff Sicklesmith counters that we should not grant *Auer* deference to the 2018 Interpretation. (Doc. 20 at 16). We should decline to do so, Plaintiff Sicklesmith maintains, because it constitutes an unreasonable interpretation of 29 C.F.R. §531.56. (*Id.*). The "dual jobs" regulation, he argues, "places some undefined temporal limit on the amount of time a tipped employee may send [*sic*] performing related and untipped work before he or she becomes an employee

10

engaged in two occupations. (*Id*. at 17 (citing *Belt v. P.F. Chang's China Bistro, Inc.*, 401 F.Supp 3d 512 (E.D. Pa. 2019))). Because the 2018 Interpretation places, in essence, no limit on the amount of related and untipped work a tipped employee may be required to perform, Plaintiff believes it is an unreasonable interpretation not entitled to deference. (*Id.* at 16-17). Furthermore, Plaintiff Sicklesmith maintains, even if we do determine the DOL's recent interpretation is a reasonable one, we should not award it *Auer* deference under the factors recently enumerated by the Supreme Court in *Kisor v. Wilke*. (*Id.* at 18 (citing 139 S. Ct. 2400 (2019))). Finally, Plaintiff Sicklesmith contends that the 2018 Interpretation does not warrant *Skidmore* deference because it lacks the "power to persuade." (*Id.* at 26-27).

For the reasons that follow, we agree with Plaintiff Sicklesmith and will decline to extend any deference to the 2018 Interpretation of 29 C.F.R. §531.56. Instead, we will interpret the Dual Jobs Regulation to include a twenty percent limit on non-tip-generating work. Accordingly, we will deny Defendant's Motion because Plaintiff Sicklesmith has adequately stated a claim for relief under the "80/20" Rule.

### A. The Court May Defer to Agency Interpretations

The Supreme Court has established several levels of deference which we may afford to the statutory and regulatory interpretations espoused by administrative agencies.[2]

*Auer* deference may be afforded by the court to an agency's interpretation of *its own regulation*. *Auer v. Robbins*, 519 U.S. 452 (1997). Before we may decide whether *Auer* deference is warranted for the DOL's recent interpretation of the Dual Jobs Regulation, however, we must determine if the regulation itself is "genuinely ambiguous." *Kisor v. Wilkie*, —— U.S. ——, 139 S. Ct. 2400, 2415, 204 L.Ed.2d 841 (2019). If we find the regulation is unambiguous, our inquiry thus ends, and we apply the unambiguous meaning. *Id*. at 2414. If the regulation is truly ambiguous, we must then consider whether to afford *Auer* deference to the agency's interpretation using the factors recently articulated by the Supreme Court

---

[2]     The first level of deference we may afford to an agency's interpretation, commonly referred to as *Chevron* deference, applies to an agency's interpretation of a *statute*, traditionally in the form of a regulation. *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984). In the case currently before us, the DOL's relevant statutory interpretation is the Dual Jobs Regulation, which interprets FLSA §203(m). 29 C.F.R. §531.56. To determine what deference is due to the 2018 Interpretation of the Dual Jobs Regulation, we must first determine whether the Dual Jobs Regulation *itself* merits *Chevron* deference. The parties did not address the application *Chevron* deference in the instant case. Nevertheless, we will afford *Chevron* deference to the DOL's Dual Jobs Regulation interpretation of FLSA §203(m) and shall move to the next step of our analysis: the application of *Auer* deference to the 2019 Interpretation of the Dual Jobs Regulation. *See Belt v. P.F. Chang's China Bistro, Inc.*, 401 F. Supp. 3d 512, 529 (E.D. Pa. 2019).

in *Kisor*. *Id*. Should we decide not to afford *Auer* deference to the DOL's recent interpretation, we must instead consider whether *Skidmore* deference is appropriate.  *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 159 (2012). Finally, should we determine that neither *Auer* nor *Skidmore* deference is warranted, we must apply the "traditional tools of interpretation" to determine the meaning of the regulation. *Id*. at 161.

### 1. The Regulation is Ambiguous

We begin, then, by asking whether the Dual Jobs Regulation is "genuinely ambiguous." *Id.* at 2415. After using "all the standard tools of interpretation" at our disposal, we find that it is. *Id.* at 2414. The Dual Jobs Regulation was promulgated to further define a tipped employee "engaged in an occupation in which [the employee] customarily and regularly receives more than $30 a month in tips." 29 C.F.R. §531.56(e). In so doing, the regulation delineates between employees who are employed in "dual jobs," for which separate wages must be paid for tipped and untipped work, and employees who engage solely in "tipped" work, who may exclusively be paid the lower tipped minimum wage. *Id*.

The regulation, however, defines only the two extremes of the "dual job" spectrum. The regulation dictates, for example, that a "dual jobs" employee is someone who regularly operates as both a maintenance man and as a waiter receiving tips. *Id*. Such an employee must be paid the full minimum wage for his

duties as a maintenance man, because tips are not regularly received in that position. *Id.* The regulation distinguishes such an employee from a "waitress who spends part of her time cleaning and setting tables, toasting bread, making coffee and occasionally washing dishes or glasses" and from a "counterman who also prepares his own short orders or who, as part of a group of countermen, takes a turn as a short order cook for the group," both of whom are not entitled to the full minimum wage for their untipped duties. *Id.*

It is easy to imagine, however, a middle ground between these illustrations—for example, a waitress who does far more than clean the occasional table, to the exclusion of tip-generating work, but who does not formally occupy two distinct roles.  The regulation itself is silent on such a situation, and leaves open the method by which we should decide when an employee is officially employed in two jobs. Can we, for example, only find an employee is engaged in "dual jobs" when she occupies two separate roles with different job titles? Or is there a situation in which an employee may be only formally employed in *one* role, but is still engaged in "dual jobs?" *See Marsh v. J. Alexander's LLC*, 905 F.3d 610, 625 (9th Cir. 2018); *see also Fast v. Applebee's Int'l*, 638 F.3d 872, 877 (8th Cir. 2011).

Furthermore, the regulation is ambiguous with regards to *how much* time an employee must spend on untipped work before there is a shift from "occasionally"

spending "part of her time" on non-tip generating work to being fully engaged in dual jobs. 29 C.F.R. §531.56(e). Indeed, the regulation is also unclear on how we would define what jobs are "related" to tipped work such that we could determine how much time an employee spends on those duties. *Id.*

We find that these questions raise sufficient ambiguity such that further interpretation is necessary for effective enforcement. We therefore move to the next phase of our analysis: determining whether to award *Auer* deference to the DOL's 2018 Interpretation of the Dual Jobs Regulation. [3]

## 2.   The DOL's 2018 Interpretation Does Not Merit *Auer* Deference

The Supreme Court has recently stated that "*Auer* deference is not the answer to every question of interpreting an agency's rules" and has implored courts to "make an independent inquiry into whether the character and context of the agency interpretation entitles it to controlling weight." 139 S. Ct. at 2415. Mindful of this new, more stringent standard, we begin with a consideration of the reasonableness of the DOL's 2018 Interpretation.

To award *Auer* deference to regulatory interpretations, we must first determine whether the interpretation is reasonable. *Kisor*, 139 S. Ct. at 2411. To be

---

[3]      See *Belt* for an in-depth explanation of the ambiguity of the Dual Jobs Regulation, written by our esteemed colleague Judge Brody. 401 F.Supp. at 530-31.

reasonable, an interpretation must be "come within the zone of ambiguity the court has identified after employing all its interpretive tools." *Id*. at 2416.

Another federal court in this Commonwealth has found the 2018 Interpretation to be *de facto* unreasonable in light of the ambiguities we previously outlined in the Dual Jobs Regulation. *See Belt* 401 F. Supp. at 533. We find that opinion to be a well-reasoned one, but need not determine the reasonableness of the 2018 Interpretation in this instance. Instead, we find that, even were the 2018 Interpretation reasonable, it nevertheless fails to merit *Auer* deference under the "non-exhaustive" set of "especially appropriate markers for identifying when *Auer* deference is and is not appropriate" articulated by the Supreme Court. 139 S. Ct. at 2411. We therefore decline to rule on its reasonableness.

We necessarily move to consideration of those "non-exhaustive" factors outlined in *Kisor*. First, the interpretation must be the agency's "authoritative" or "official position," and cannot merely represent an *ad hoc* statement that does not reflect the official views of the agency. *Id.* at 2415-16. Second, the interpretation must "in some way implicate [the agency's] substantive expertise. *Kisor*, 139 S. Ct. at 2417. Here, neither of these "markers" is in dispute. (Doc. 20 at 23). The DOL promulgated the 2018 Interpretation with the express intent that it represent the agency's official position. U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter FLSA 2018-27 (Nov. 8, 2018), 2018 WL 5921455 (the 2018 Interpretation

is "an official statement of [DOL] policy and an official ruling"). Furthermore, the

interpretation attempts to provide guidance to employers so that they may fully

comply with the FLSA regarding wage and hour concerns. *Id*. It cannot be

reasonably disputed that such subject matter falls within the purview of the

Department of Labor.

We therefore turn our attention to the final "marker" delineated by the

Supreme Court: whether the agency's interpretation reflects "fair and considered

judgment." *Kisor*, 139 S. Ct. at 2417. On this issue, Defendant argues that the 2018

Interpretation was promulgated to create a "workable paradigm" after the 80/20

Rule had caused confusion among employers. (Doc. 9 at 22). Because the goal of

the change was to clarify, Defendants maintain, we should defer to the "fair and

considered judgment" of the DOL. (*Id.*). Furthermore, the 2018 Interpretation does

not cause "unfair surprise" to the Plaintiffs in this case, Defendants contest,

because the 2018 Interpretation has been the DOL's "official interpretation" for

over a year. (*Id.* at 21).

Plaintiff Sicklesmith again protests, arguing that the 2018 Interpretation is an

"express reversal" of nearly 30 years of DOL guidance, which causes unfair

surprise to Plaintiffs. (Doc. 20 at 24). Because the courts have consistently deferred

to the 80/20 Rule since 1988 and because the DOL has offered an insufficient basis

for the drastic change, Plaintiff Sicklesmith urges us to find that the 2018 Interpretation does not represent "fair and considered judgment." (*Id.*).

We agree with Plaintiff Sicklesmith and find that deference to the 2018 Interpretation would cause "unfair surprise" to Defendant's employees. To award *Auer* deference, we must find that an agency's regulatory interpretation is a result of "fair and considered judgment." *Kisor*, 139 S. Ct. at 2417. In so doing, we cannot "defer to a merely 'convenient litigating position' or a [a] '*post hoc* rationalizatio[n] advanced"' to "'defend past agency action against attack.'" *Id.* (citing *Christopher*, 567 U.S. at 155 (quoting *Bowen v. Georgetown Univ. Hospital*, 488 U.S. 204, 213 (1988) and *Auer*, 519 U.S. at 462)). Furthermore, we cannot "defer to a new interpretation, whether or not introduced in litigation, that creates 'unfair surprise' to regulated parties." *Id.* (citing *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 170 (2007)). Unfair surprise occurs when an agency drastically shifts its interpretation of a rule. *Id.* The Supreme Court has cautioned us that *Auer* deference should only "rarely" be given when an agency's new interpretation conflicts with a prior one. *Id.* (citing *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504 (1994)).

Here, it is undisputed that the 2018 Interpretation is a drastic change to DOL policy. The DOL purports to shift its focus from the *amount of time* spent on untipped work to the *temporal proximity* of that untipped work to tipped work. U.S.

Dep't of Labor, Wage & Hour Div., Opinion Letter FLSA 2018-27 (Nov. 8, 2018),

2018 WL 5921455. Furthermore, the 2018 Interpretation expressly overrules the

80/20 Rule after over 30 years of its enforcement, both by the courts and by the

DOL itself.

In the face of such longevity and consistency, we are mindful that the

Supreme Court requires compelling justification for such a dramatic shift in agency

interpretation. *Kisor*, 139 S. Ct. at 2417. We see no such rationalization here. The

DOL points to generalized "confusion" and "inconsistent application" as the basis

for the change. U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter FLSA

2018-27 at 2 (Nov. 8, 2018), 2018 WL 5921455. In so doing, the 2018

Interpretation cites two cases that come to different conclusions on the 80/20 Rule.

*Id*. However, as our fellow federal courts have explicitly noted, the cases used by

the DOL to argue that the 80/20 Rule is inconsistently applied are vastly

overstated:

> The 2018 DOL Letter noted an apparent disagreement among
> courts in whether to accord the 20% guideline any weight. The
> DOL explained that the Southern District of Florida's decision
> in *Pellon v. Bus Representation International, Inc.*, 528 F.
> Supp. 2d 1313 (S.D. Fla. 2007) *aff'd* 291 F. App'x 310 (11th
> Cir. 2008), "rejected" the 20% threshold finding it confusing
> and unworkable. However, contrary to the DOL's
> recitation, *Pellon* never squarely rejected the 20% guideline
> and instead sidestepped the question by finding it
> "unnecessary" to reach the validity of the 20% guideline on the
> particular facts of that case. *Pellon*, 528 F. Supp. 2d at 1313–
> 14; *accord Vasquez v. MC Miami Enters., LLC*, No. 1:19-cv-

> 22459, 2019 WL 4855740, at *3 n.5 (S.D. Fla. Sept. 12, 2019).
> Thus, while *Pellon* may have criticized the 20% threshold as
> fraught with difficulty in implementation, the court did not
> reach whether to accord it deference. *See Pellon*, 528 F. Supp.
> at 1314. This Court finds it difficult to consider the DOL
> "persuasive" when it distorts the import of the judicial
> determinations on which it relies. . . Even more unsettling,
> when the DOL Letter was issued, a vast majority of courts had
> already adopted the 20% rule without difficulty. Thus, where
> the DOL Letter announces confusion, this Court sees
> consensus.

*Flores v. HMS Host Corp.*, No. 8:18-CV-03312-PX, 2019 WL 5454647, at *6 (D.

Md. Oct. 23, 2019). Indeed, since *Pellon* was decided, the vast majority of cases,

clearly defer to the 80/20 interpretation. *See, e.g.*, *Belt,* 401 F.Supp. at 534, n. 20

(collecting cases that defer to the 80/20 Rule). We are therefore unmoved by the

DOL's proffered justification of creating a more "workable" rule.

Because federal courts have nearly uniformly given deference to the 80/20

Rule, even after the promulgation of the 2018 Interpretation, and in light of the

drastic policy shift contained in that interpretation, we find that deferring to the

2018 Interpretation would cause "unfair surprise" to Plaintiffs. An agency's radical

change in policy rarely merits *Auer* deference, and we see no persuasive reasons

here that compel us to award it. We therefore decline to provide *Auer* deference to

the 2018 Interpretation of the Dual Jobs Regulation.

### B.  The 2018 Interpretation is Not Entitled to *Skidmore* Deference

Having determined that the 2018 Interpretation does not merit *Auer* deference, we next consider whether *Skidmore* deference is appropriate. *Kisor*, 139 S. Ct. at 2414. We apply *Skidmore* deference when an agency interpretation has the "power to persuade." *Id.* In making such a determination, we must employ "a sliding-scale test in which the level of weight afforded to an interpretation varies depending on [the] analysis of the enumerated factors," including "whether the interpretation was: (1) issued contemporaneously with the statute; (2) consistent with other agency pronouncements; (3) reasonable given the language and purposes of the statute; (4) within the expertise of the relevant agency; and (5) part of a longstanding and unchanging policy." *Sec'y United States Dep't of Labor v. Am. Future Sys. Inc.*, 873 F.3d 420 (3d Cir. 2017) (internal quotation marks omitted).

We find that the 2018 Interpretation lacks the "power to persuade," and so shall not afford it *Skidmore* deference. As already discussed, the 2018 Interpretation represents a stark shift in DOL policy. Consequently, we join with our sister district courts and will decline to afford *Skidmore* deference to the 2018 Interpretation. *See Belt v. P.F. Chang's China Bistro, Inc.*, No. 18-3831, 2019 WL 3829459, at *14–16 (E.D. Pa. Aug. 15. 2019); *Spencer v. Macado's, Inc.*, —— F. Supp. 3d ——, No. 6:18-cv-00005, 2019 WL 2931304, at *5–6 (W.D. Va. July 8,

2019); *Ersy v. P.F. Chang's China Bistro, Inc.*, 373 F. Supp. 3d 1205, 1211 (E.D. Ark. 2019); *Cope v. Let's Eat Out, Inc.*, 354 F. Supp. 3d 976, 986 (W.D. Mo. 2019); *but see Shaffer v. Perry's Rests., Ltd.*, No. SA-16-CA-1193-FB, 2019 WL 2098116, at *1 (W.D. Tex. Apr. 24, 2019).

### C. The 80/20 Rule is a Reasonable Interpretation

Having decided that the 2018 Interpretation does not merit deference, we turn to the "traditional tools of interpretation" to determine the meaning of the Dual Jobs Regulation. *Christopher*, 567 U.S. at 161. When, as is the case here, the regulation itself is ambiguous, the Third Circuit has dictated that we "adopt the best or most reasonable interpretation." *F.T.C. v. Wyndham Worldwide Corp.*, 799 F.3d 236, 252 (3d Cir. 2015). To do so, we must "consider the ordinary and natural meaning of the regulatory language within its context and the [regulation's] overarching purpose." *McCann v. Unum Provident*, 907 F.3d 130, 144 (3d Cir. 2018).

Here, as we have already discussed, the ambiguous Dual Jobs Regulation clearly delineates between tipped and untipped work, each of which must be compensated at different rates when the "untipped" work is done more than "occasionally." 29 C.F.R. §531.56(e). However, the Dual Jobs Regulation places no concrete limits on the amount of "untipped" work that must be performed

before an employee is engaged in "dual jobs," and so further interpretation is necessary. *See supra* Part IV.A.1.

In conformity with thirty years of DOL policy and the routine use of a twenty percent limit on untipped work, we will now find the 80/20 Rule to be a reasonable interpretation of the term "occasionally," as it is used in 29 C.F.R. §531.56(e). By definition, "occasionally" means "now and then, at times, sometimes; irregularly and infrequently." *Belt* 401 F.Supp at 539 (citing OED Online, https://www.oed.com/view/Entry/130122 (last visited Feb. 24, 2020). We therefore take the "ordinary and natural meaning" of "occasionally" to mean that a tipped employee may only perform non-tip producing tasks infrequently if their employer desires to pay them solely the tipped minimum wage. With such a definition in mind, we find a twenty percent threshold to be a reasonable limit on the term "occasionally."

In so finding, we are cognizant of the fact that the DOL has imposed a twenty percent limit on untipped work for the past thirty years. U.S. Dept. of Labor, Wage & Hour Division, Field Operations Handbook at § 30d00(e) (Dec. 9, 1988). Such longstanding guidance lends credence to the reasonableness of this interpretation, as does the long history of court deference to that percentage. *Belt*, 401 F.Supp. at 536; *see also Fast*, 638 F.3d at 881 (the DOL reliably utilizes "a 20 percent threshold to delineate the line between substantial and nonsubstantial work

in various contexts within the FLSA;" *Marsh* 905 F.3d at 629 (holding that the 80/20 Rule is consistent with DOL interpretation). Indeed, we further find that a twenty percent limit provides clear expectations to both employers and employees. A quantitative measure allows all involved parties to easily and unambiguously determine how much time an employee may spend on various tasks, and at what rate. Such a clear limit will help to avoid disputes about "reasonableness" or appropriate temporal proximity to tipped work. Indeed, as our sister court has noted, "it is not impracticable for an employer to keep track of time spent on related tasks by requiring employees to clock in any time spent" performing untipped related work, and so determine when such work surpasses the twenty percent limit. *Marsh*, 905 F.3d at 631.[4]

We therefore find that the 80/20 Rule is a reasonable interpretation of the Dual Jobs Regulation and will thus apply it to the instant case.

### D. Plaintiff Sicklesmith has Sufficiently Stated a Claim

Finally, we note that Plaintiff Sicklesmith has successfully stated a claim for which relief may be granted. Because we will apply the 80/20 Rule to interpret the Dual Jobs Regulation, we look for an allegation in Plaintiff Sicklesmith's

---

[4]   We note, as did the court in *Belt*, that a reasonable interpretation of the Dual Jobs Regulation could well have led to a percentage of time *other* than twenty percent. In light of the longstanding 80/20 Rule, however, we find twenty percent to be the "best" interpretation, as it clearly avoids surprise to all parties. *Belt*, 4014 F.Sup. at 537.

Complaint that he and other similarly-situated employees performed non-tip-generating tasks, without being compensated at the Pennsylvania minimum wage, for greater than twenty percent of their time at work. We explicitly see such an allegation here. (Doc. 1 at ¶¶ 12; 14). Because Plaintiff has alleged that he and other servers employed by Defendant performed non-tip-generating tasks for approximately thirty percent of their working hours, we will deny Defendant's Motion and allow Plaintiff Sicklesmith's claims to survive.

## V.      CONCLUSION

For the foregoing reasons, we shall deny Defendant's Motion to Dismiss, (Doc. 8), in its entirety.

**NOW, THEREFORE, IT IS HEREBY ORDERED THAT:**

1. Defendant's Motion to Dismiss, (Doc. 8), is **DENIED**.

2. The parties **SHALL** file a stipulation selecting a trial date and other relevant case management dates within **fifteen (15) days** of the date of this Order. A copy of the Court's calendar is attached to this Order for the parties' convenience.

<u>s/ John E. Jones III</u>
John E. Jones III
United States District Judge

**Judge Jones**
**2020 Court Calendar**
**(revised Jan 2020)**

| Trial List | Discovery Cut-off | Dispositive Motions Cut-off | Final Pre-Trial Conferences | Jury Selection |
|---|---|---|---|---|
| January | 7/31/19 | 9/2/19 | 12/2/19 | 1/6/20 |
| February | 8/30/19 | 10/1/19 | 1/3/20 | 2/4/20 |
| March | 9/30/19 | 11/1/19 | 2/3/20 | 3/3/20 |
| April | 10/31/19 | 12/2/19 | 3/2/20 | 4/7/20 |
| May | 11/29/19 | 1/3/20 | 4/6/20 | 5/5/20 |
| June | 12/31/19 | 2/3/20 | 5/4/20 | 6/2/20 |
| July | 1/31/20 | 3/2/20 | 6/1/20 | 7/7/20 |
| August | 2/28/20 | 4/1/20 | 7/6/20 | 8/4/20 |
| September | 3/29/20 | 5/1/20 | 8/3/20 | 9/2/20 |
| October | 4/30/20 | 6/1/20 | 9/1/20 | 10/5/20 |
| November | 5/31/20 | 7/1/20 | 10/1/20 | 11/3/20 |
| December | 6/28/20 | 8/3/20 | 11/2/20 | 12/2/20 |

**Judge Jones**
**2021 Court Calendar**
**(revised Jan 2020)**

| Trial List | Discovery Cut-off | Dispositive Motions Cut-off | Final Pre-Trial Conferences | Jury Selection |
|---|---|---|---|---|
| January | 7/31/20 | 9/1/20 | 12/1/20 | 1/5/21 |
| February | 8/31/20 | 10/1/20 | 1/4/21 | 2/2/21 |
| March | 9/30/20 | 11/2/20 | 2/1/21 | 3/2/21 |
| April | 10/30/20 | 12/1/21 | 3/1/21 | 4/5/21 |
| May | 11/30/20 | 1/4/21 | 4/2/21 | 5/4/21 |
| June | 12/31/20 | 2/1/21 | 5/3/21 | 6/2/21 |
| July | 1/29/21 | 3/1/21 | 6/1/21 | 7/7/21 |
| August | 2/26/21 | 4/1/21 | 7/6/21 | 8/3/21 |
| September | 3/31/21 | 5/321 | 8/2/21 | 9/7/21 |
| October | 4/30/21 | 6/1/21 | 9/1/21 | 10/4/21 |
| November | 5/31/21 | 7/1/21 | 10/1/21 | 11/2/21 |
| December | 6/30/21 | 8/2/21 | 11/1/21 | 12/2/21 |